I., PLAINTIFF-APPELLANT, v. D., DEFENDANT-RESPONDENT.

Superior Court of New Jersey
Appellate Division

Argued February 1, 1960—Decided March 7, 1960.

Before Judges CONFORD, FREUND and HANEMAN.

*Mr. Alfonso Bivona* argued the cause for plaintiff-appellant.

*Mr. Dino D. Bliablias* argued the cause for defendant-respondent (*Mr. Anthony A. Calandra,* attorney; *Mr. Ralph C. DeRose* on the brief).

The opinion of the court was delivered by

FREUND, J. A. D.   Plaintiff, the unmarried mother of an illegitimate child born to her on December 23, 1958, instituted this filiation proceeding against the defendant in the municipal court under *R. S.* 9:16–2, which provides:

"A child born out of wedlock shall be entitled to support and education from its father and mother to the same extent as if born in lawful wedlock."

After trial the defendant was adjudged to be the father of the infant and directed to pay $10 weekly toward its support. Defendant prosecuted an appeal to the County Court under the authority of *Leonard v. Werger,* 21 *N. J.* 539 (1956). There was a trial *de novo* without a jury, resulting in a reversal of the judgment on the ground that the plaintiff failed to carry the burden of proving by a preponderance of the evidence that the defendant was the father. *R. R.* 5:2–8; 7:15–4.   The matter is before us on the mother's appeal.   The main point justifying consideration is that the County Court judgment in favor of defendant was overwhelmingly against the weight of the evidence.

In aid of our determination and in fairness to the infant, we have examined the full transcript of the proceedings in the County Court.   The facts, as gleaned therefrom, are as follows.

Plaintiff has known the defendant and his family since they came from Europe, over ten years ago.   On Thanksgiving Day, 1957, the parties became engaged to be married, and preparations were made for the wedding to be held on June 8, 1958.   Plaintiff, then 20 or 21 years of age, lived with her parents in New York, and the defendant resided with his parents, brother, widowed sister, and niece in a one-family home in Maplewood.   It was a matter of "routine"

for the plaintiff to come to the defendant's home on Saturdays, sleep with his sister, and return to New York on Sunday night.

It was plaintiff's testimony that on two, or possibly three, of these weekend visits she and the defendant engaged in sexual intercourse. Plaintiff stated that on the last Saturday of March 1958 they had gone to the movies, returned to the house at about 11:00 or 11:30 P. M., and "watched television for a while." The defendant then insisted upon having relations, pointing out that they were "going to be married in a few weeks," and that "it doesn't make any difference." Plaintiff yielded, and the experience marked her "first relations" with any man. Two weeks later, again after a Saturday night out, plaintiff had her "second relation with him." Plaintiff testified that on the following Saturday, when she advised the defendant of the possibility of pregnancy, he replied:

"Don't worry about it. What's the difference? We are going to get married in a couple of months. So the wedding is late, the baby is on time."

A third act of intercourse was committed at his home on another Saturday in April 1958. The defendant's family on each occasion had retired for the night, leaving the engaged couple downstairs to watch television.

The defendant denied having intercourse with the plaintiff and denied that any Saturday in March 1958 had any particular significance to him. He denied having been informed of her pregnancy. He denied making an attempt to have sexual relations with her either prior to or during the engagement period. He admitted "necking," "petting" and kissing the plaintiff, but claimed he was never left alone with her in the house after coming in from a date since his "mother used to be up." He testified that as he sat in the sun parlor with his fiancee, his mother used to sit in the living room watching another television set. The two rooms

were separated by a glass door, and the mother was always within sight—waiting until they went to bed. Defendant petted the plaintiff when the mother "wasn't looking."

Defendant told the court on cross-examination that during the Christmas holiday in 1957 there had been an argument.

"Q. You were mad? A. But we made up. We had an argument, then we made up, and I tried to touch her with my hand. She says, 'Don't touch me, because I am pure.'

Q. And at that time was the price for making up, that you wanted to have intercourse with her? A. I didn't have intercourse. She told me.

Q. You tried, isn't that what you said? A. I tried.

Q. Yes. A. I tried.

* * * * * * * *

THE COURT: Did you tell her that you would not make up unless she permitted you to have intercourse with her?

THE WITNESS: Yes."

Defendant testified he did not press his demand at that time or renew his request thereafter because the plaintiff told him she wanted "to be pure" when she walked "up to the altar" and because he, too, really wanted a "pure girl."

On a Sunday in May 1958, shortly before the scheduled wedding, the couple and the defendant's family went to visit friends in Pennsylvania. Plaintiff was struck by a soft ball, and told the defendant in Italian to "drop dead." Defendant reciprocated with an expression of vulgarity and with an attempted slap and told plaintiff to "find yourself another guy." She testified that after being driven home to New York that night, she told him she may have made one mistake but was not going to "make another one by marrying you and having it miserable for the rest of my life." Plaintiff admitted it was she who refused to go through with the wedding. Two weeks after the Pennsylvania incident and the canceling of banns, plaintiff departed for Italy with a friend, where she remained until August 1958.

Before her son was born in a New York hospital in December 1958, plaintiff instituted a bastardy proceeding against the defendant in New York. Jurisdiction over the

person of the defendant could not be obtained, and plaintiff moved to Newark where the present action was commenced.

At the conclusion of the proofs, the trial judge rendered a brief opinion in which he emphasized the difficulty of this kind of case and the fact that he really did not know the solution. He did not state he was unimpressed with plaintiff's credibility, nor did he express a view as to the defendant's truthfulness or lack of it. But one fact above all others appears to have weighed decisively in the court's conclusion: the strangeness of a young girl's calling off the marriage and refusing to "give a name to her child" for so trivial a reason as the Pennsylvania argument. Apparently because of that circumstance, the trial judge concluded that:

"There is a grave doubt in my mind as to whether or not this defendant is the parent of the child. I don't know. And the burden is upon the plaintiff to prove by a preponderance of the evidence and I am not satisfied that this has been done. I am going to find that he is not the father. All right."

Although we appreciate the trial judge's difficulty and respect his frank acknowledgment of doubt, we cannot agree that a judgment in favor of the putative father was dictated for that reason or because the plaintiff broke the engagement.

██ As to the presence of doubts, it is settled that in a bastardy proceeding, the burden of proof does not require proof of paternity beyond a reasonable doubt, but merely by a fair preponderance of the evidence. *Overseer of Poor of Town of Montclair v. Eason,* 92 *N. J. L.* 199, 201–202, 1 *A. L. R.* 631 (*E. & A.* 1918). Neither is it necessary to a finding against the putative father that the testimony of the mother be corroborated. *Overseer of Poor of Town of Montclair v. Eason, supra.*

██ Regarding plaintiff's conduct after becoming pregnant, the mere fact that she elected not to marry the defendant was not sufficient reason for reversal of the order of filiation; it is not incumbent upon a young woman to marry against her will in order to give her unborn child a name, and she may refuse to do so with or without

provocation. Although the mother's reluctance to marry the putative father may in some cases point to her involvement with another man, it is significant that there is no proof on the present record that plaintiff had any other intimate associations in March or April 1958, when the child was begotten. Defendant claimed he had seen in plaintiff's wallet a picture of her with a former boy friend, but there was no present relationship with him established, and the plaintiff even denied having the picture. There is presently no evidentiary basis for the possibility of conception through the act of a specific other man.

On the other hand, considering the situation and circumstances of the parties, including the length of the courtship period and the imminency of the wedding, it is but natural to deduce that the defendant was responsible. There is not only the defendant's concession that the week-end visits of his fiancee afforded the opportunity for habitual intimacy, but the admission on cross-examination of an actual demand for total indulgence as the "price" for rapproachement after a dispute. The defendant's desire for intercourse at Christmas 1957, referred to in his direct and cross-examination, is strongly corroborative of plaintiff's testimony as to the act on the Saturday in question. 2 *Wigmore, Evidence* (3*d ed.* 1940), § 401. Moreover, while defendant's mother, if called as a witness, undoubtedly could not have testified to anything improper done in her sight or hearing, she could have corroborated the defendant's version that she was in the next room and was the last person in the house to retire on each occasion.

Every intendment is in favor of the judgment under review, and the trial court's findings of fact will not be disturbed unless we are well satisfied that the finding is a mistaken one. *Midler v. Heinowitz,* 10 *N. J.* 123, 128 (1952); *Gosschalk v. Gosschalk,* 48 *N. J. Super.* 566, 579 (*App. Div.* 1958); *Gregory Manor v. City of Clifton,* 53 *N. J. Super.* 482, 492 (*App. Div.* 1959). While we do not ordinarily make findings of fact on conflicting testimony

contrary to those of a trial judge sitting without a jury, we nevertheless have the power to do so, giving due regard to the opportunity of the trial judge to judge of the credibility of the witnesses. *R. R.* 1:5–4(*b*); *Borough of Park Ridge v. Salimone,* 21 *N. J.* 28, 39 (1956). Moreover, although we are reviewing the County Court judgment, we know that another judge, hearing what was represented as being substantially the same proof, found for the plaintiff.

In our judgment there is, in the record of the proceedings below, no support for the defendant's contention that someone else must have been responsible for plaintiff's pregnancy. The direct and circumstantial evidence clearly preponderates in favor of the contrary hypothesis, and we would so find and determine were it not for a matter, now to be discussed, which requires that the case be remanded to the County Court for the taking of additional testimony.

Plaintiff testified on direct examination that she never had sexual intercourse with any person other than the defendant at any time. On cross-examination plaintiff was asked when she "first started dating boys." Objection was made, and the court inquired of defendant's counsel as to his purpose. Counsel replied that the purpose was "to develop the theme of whether or not this young lady ever had relations with another man." The court sustained the objection, the question not having been asked for impeachment purposes.

The court's ruling in this instance was proper. The mother's character or reputation as to previous unchastity is generally held to be immaterial and inadmissible in a bastardy proceeding, for the sole issue is whether or not the defendant is the father of the child. 7 *Am. Jur., Bastards,* § 118 (1937); 10 *C. J. S. Bastards* § 85(*a*) (1938). Offers of evidence of the mother's intimate associations with others than the accused, unlimited as to time or at a time when in the course of nature conception could not have taken place, are to be rejected as collateral and prejudicial if unaccompanied by evidence showing probability of continuance

or resumption of such relations. *Brennan v. State,* 151 *Md.* 265, 134 *A.* 148, 48 *A. L. R.* 342 (*Ct. App.* 1926); *State v. Patton,* 102 *Mont.* 51, 55 *P. 2d* 1290, 104 *A. L. R.* 76 (*Sup. Ct.* 1936); *Dicks v. United States,* 72 *A. 2d* 34, 36 (*D. C. Mun. App.* 1950); *Ellison v. United States,* 85 *A. 2d* 917 (*D. C. Mun. App.* 1952).

Where, however, the putative father seeks to show that the mother had sexual intercourse with other men at about the time the child was begotten, the evidence is admissible to substantiate his denial of paternity, and the mother may be interrogated on this point. 7 *Am. Jur., Bastards,* § 119 (1937); Annotation, 104 *A. L. R.* 84, 85 (1936). On the same principle, evidence of her intimate associations during such period is admissible. 1 *Wigmore, op. cit., supra,* § 133. The defendant need not adduce positive evidence of an act of intercourse with a specific other man; he has the "right to pursue any line of investigation that is directed to developing conduct on her part that may even remotely suggest such relation." 10 *C. J. S. Bastards* § 85(*b*), *p.* 174 (1938).

In the instant case, there were two occasions during the trial when the trial judge sustained objections to inquiries by defendant's counsel concerning plaintiff's associations during the critical time period. The first occurred when counsel was cross-examining plaintiff about a restaurant or "hangout" in New York which plaintiff may have been in the habit of frequenting on weekday nights. Plaintiff testified she went to this restaurant with "girl friends" to "eat pizza," but further information was not elicited because an objection to this line of questioning was sustained. The second ruling excluding possibly pertinent evidence took place on direct examination of defendant's sister. The sister was asked whether she had ever had a discussion with the plaintiff concerning "your brother and other boy friends." When the witness indicated there had been such a discussion, objection was made and apparently sustained, and the question was withdrawn.

The defendant's counsel makes no point of these rulings on appeal, undoubtedly because he is bent upon defending the result reached below. We are, however, reluctant to visit the defendant with paternity of a child where it is possible that legal evidence he was foreclosed from developing on cross-examination might have been weighty enough to change the preponderance of the evidence as to his responsibility. The interests of justice require that the case be remanded to the County Court for the continuance of plaintiff's cross-examination in the respects noted above, and for the taking of such additional proofs as either of the parties wishes to adduce concerning plaintiff's other male associations, or the absence thereof, during the period when the child could have been conceived. The trial judge will then arrive at his own independent conclusions in the light thereof, of the prior proofs, and of the views expressed in this opinion.

Reversed and remanded.